COMPLAINT AGAINST Judge Donald J. STERLINSKE.

Supreme Court

*No. 84–1608—J. Argued April 2, 1985.—Decided April 17, 1985.*
(Also reported in 365 N.W.2d 876.)

There was a brief by *James E. Doyle, Jr., Webb, Weiden, Doyle & Ritz,* Madison, and *Elena Cappella,* executive director, Judicial Commission of Wisconsin, and oral argument by *James E. Doyle, Jr.*

There was oral argument by *Robert O. Weisel,* Rice Lake, on behalf of Judge Sterlinske.

PER CURIAM. *Judicial disciplinary proceeding; discipline imposed.*

We review, pursuant to sec. 757.91, Stats., the findings of fact, conclusions of law and recommendation of the judicial conduct panel in this proceeding brought by the Judicial Commission against the Honorable Donald J. Sterlinske, formerly circuit judge for Rusk county, alleging his aggravated and persistent failure to comply with the standards of the Code of Judicial Ethics, SCR chapter 60, and for his wilful violation of rules of that Code. The panel concluded that the respondent engaged in misconduct and has recommended that he be removed from the position of circuit judge. The respondent did not object to the panel's findings and conclusions, and we accept them. We agree that the respondent's misconduct warrants his removal from the office of circuit judge for Rusk county, but we note that the respondent, by letter dated March 7, 1985, informed the director of state courts that he was submitting to the governor of Wisconsin his letter of retirement from that office, effective April 1, 1985. Consequently, our order for removal would have no practical effect concerning the judicial office previously held by the respondent. Nevertheless, because the respondent is otherwise eligible to serve temporarily as a reserve judge of the court of appeals or the circuit court for any county, sec. 753.075(2), we determine, as appropriate discipline for his misconduct, that the respondent be removed from eligibility to serve as a reserve judge.

This proceeding was commenced by the filing of the Judicial Commission's complaint on August 15, 1984. After the judicial conduct panel filed its report with the court on March 4, 1985, the respondent submitted his

resignation as circuit judge for Rusk county and, on March 14, 1985, filed a motion seeking the dismissal of the complaint in this matter on the ground that, as of April 1, 1985, he would no longer be a circuit judge and this court would no longer have jurisdiction over him. We denied that motion to dismiss by order of April 1, 1985.

The judicial conduct panel consisted of the Honorable Neal P. Nettesheim, presiding judge, the Honorable Burton A. Scott, and the Honorable Ted E. Wedemeyer, Jr. In its report, the panel concluded that the respondent engaged in judicial misconduct, as defined in sec. 757.81 (4), Stats.,[1] in connection with seven judicial proceedings over which he presided as judge. A summary of the panel's findings and conclusions, to which the respondent interposed no objection, follows.

**State v. Marguerite Eades.** In this criminal case, which was tried to a jury on October 23, 1980, the respondent prepared jury instructions and a verdict. However, no traditional or formal jury instruction and verdict conference had been held between the respondent and the attorneys after the close of evidence in which counsel would have had an opportunity to approve, comment on or object to the propriety of the proposed instructions and verdict. The defendant was convicted of two counts of felony welfare fraud and was sentenced to concurrent terms of two years and one year in the state prison.

The defendant retained other counsel to represent her to pursue appropriate postconviction proceedings. After examining the court file on January 29, 1981, that attorney filed postconviction motions on March 26, 1981, raising among other issues the question of the propriety of the jury instructions.

---

[1] Sec. 757.81 (4), Stats., defines "misconduct" to include:
"(a) Wilful violation of a rule of the code of judicial ethics."

On a date following January 29, 1981, the respondent asked his court reporter why the trial transcript did not indicate a jury instructions and verdict conference between the court and counsel. The reporter consulted his trial notes and confirmed that the original transcript showing no such conference was correct. The reporter also reviewed the court clerk's minutes of the proceedings, which indicated that at 3:43 p.m. testimony was closed and the court conferred with counsel; at 3:45 p.m. closing arguments began. Based upon these minutes and the respondent's inquiries, the reporter then modified the trial transcript to include a parenthetical note stating that at the close of testimony the court conferred with the attorneys, and a copy of the modified transcript page was sent to counsel.

Also after January 29, 1981, the respondent dictated and signed a "certificate" attesting to the fact that an instructions and verdict conference had been held in his chambers and, further, that counsel for the parties had agreed to the proposed instructions and verdict. The respondent directed his reporter to date that "certificate" October 23, 1980, the date of the original trial, and caused it to be stamped by the reporter with the clerk's filing stamp, showing it had been placed in the court file on the date of the trial. The respondent also caused the docket sheet record to be altered by the reporter to indicate that the "certificate" was filed on the date of the trial.

On April 9, 1981, the respondent wrote to the defendant's counsel concerning the postconviction motions that had been filed, stating:

"The file in the matter indicates that there was a conference held between all of the attorneys, the instructions were gone over carefully, and they were approved by both the district attorney and Mrs. Eades' counsel at that time.

"In view of these circumstances it is difficult to understand upon what basis you now claim there was an instructional error."

On May 22, 1981, the respondent issued a decision denying those postconviction motions, stating in part:

"Prior to the submission of the verdict and the charge to the jury, the Clerk's minutes indicate that a conference was held in chambers, and that the parties and the attorneys for the parties stipulated and agreed that the verdicts as submitted to the jury was approved by both, and likewise there was no objection to any of the instructions as proposed by the Court. This was accomplished at 3:43 P.M. after the closing of the testimony of the parties."

The defendant's counsel then filed a notice of appeal, and he discovered in the court file the respondent's "certificate," which had not been there when he examined the file on January 29, 1981. The attorney also discovered a neatly typed docket sheet different from the docket sheet in the court file when he first examined it.

The "certificate" materially misrepresented what actually had occurred during the trial, and it was inserted in the record at the direction of the respondent with the intention of misleading others regarding those proceedings. The respondent took those actions without notice to the defendant, her counsel, or the district attorney. The defendant's conviction was subsequently summarily reversed by the court of appeals, but the record does not reflect the specific grounds for the reversal. In any event, the defendant already had been released on parole.

**State v. Roland Towers.** In the fall of 1981, the respondent's daughter was involved in an ongoing dispute with her employer, the Bruce School Board. On September 4, 1981, a grievance hearing concerning this dispute was conducted before a Wisconsin Employment Relations Commission (WERC) hearing examiner. The

respondent attended that hearing and, before the hearing began, introduced himself to the examiner, stated that he was a close friend of the WERC chairman, and inquired as to the chairman's health. The respondent directed at least one question to the examiner and was told to direct his questions or statements to or through the parties' representatives. Thereafter, the respondent communicated with his daughter's representative during the hearing.

Prior to November 25, 1981, a summons and criminal complaint were issued in *State v. Towers,* directing the defendant to appear before the respondent on December 7, 1981, for an initial appearance. The defendant was the president of the Bruce School Board, and the complaint charged a felony offense prohibiting a public officer from entering into a contract in which he had a private pecuniary interest. The complaint alleged that the defendant's oil company had contracted with the school district for the delivery of approximately $57,000 worth of products.

On November 30, 1981, the defendant's attorney filed a request for substitution of judge, pursuant to sec. 971.20, Stats. On December 3, 1981, after being told that the initial appearance would still be conducted despite the substitution request, the defendant's attorney filed a motion for recusal of the respondent, together with a supporting affidavit making reference to the ongoing dispute between the Bruce School Board and the respondent's daughter, the defendant's position as president of the school board, the respondent's conduct at the September 4, 1981, grievance hearing, and the defendant's fear that the respondent would set exorbitant and unreasonably high bail.

The respondent presided at the initial appearance on December 7, 1981. The district attorney made no recommendation as to bail, and the defendant's attorney sought

permission to take his client's testimony for the purpose of showing his suitability for release on bail. The respondent replied that there was no doubt in his mind that the defendant would appear for trial, stating that he knew the defendant had business and family ties to the Bruce area and that he was a long-term resident of Bruce.

The respondent set bond in the amount of $10,000 and rejected the defendant's request for a signature bond, stating that he woulld have to post $10,000 cash or pledge sufficient property to ensure payment of that amount. He further stated that, because he was honoring the motion for substitution of judge, he no longer had jurisdiction to determine what property would be sufficient as a pledge and that the judge subsequently assigned to the case would have to decide that issue. The respondent stated that he would "in due course" notify the court administrator's office regarding the assignment of another judge, and he specifically "enjoined" the defendant's attorney from contacting the court administrator's office in order to expedite the assignment of a new judge. The respondent further stated that the request for substitution would be forwarded to the administrator's office "if and when I get around to signing the request for substitution . . . ." After stating that there was no doubt in his mind that the defendant would appear for further proceedings, the respondent said, "However, those who play with the sword may perish by the sword." Following the initial appearance, the defendant was held in jail for approximately one hour until cash bail was posted.

**Langhoff v. Langhoff.** The petitioner in this proceeding was clerk and a member of the Bruce School Board. On October 7, 1983, while the action was pending, the respondent wrote to two members of the Bruce School Board, commending them for a position they had taken

favorable to his daughter in her employment dispute with the board. The letter, written on official stationery and signed by the respondent as circuit judge, criticized those other members of the board, the petitioner among them, who had adopted a contrary position.

On the basis of that letter, the petitioner's attorney filed a motion for disqualification of the respondent in the action. On October 14, 1983, at the hearing on the disqualification motion, the respondent, while granting the motion, berated the petitioner's attorney, declared that his daughter had been harassed by the school board, stated that the school board was paranoid, and indicated that he would chastise people who tamper with justice.

**Silvernale v. Silvernale.** Mr. Silvernale had been experiencing substantial and prolonged difficulties exercising visitation rights with his children, who were in the custody of his former wife. The judgment of divorce provided Mr. Silvernale reasonable visitation rights. Following lengthy negotiations, the parties and their attorneys reached a stipulation modifying the "reasonable visitation" language of the judgment and, instead, guaranteeing Mr. Silvernale specific visitation rights on specified dates. That stipulation, approved by another judge, provided that if Mrs. Silvernale were separated from the children for the purpose of military training or schooling, the children would be placed in the temporary custody of Mr. Silvernale, provided they continued to attend the same school.

Subsequently, after Mrs. Silvernale arranged for military training or schooling, thereby entitling Mr. Silvernale to temporary physical custody of the children under the terms of the stipulation, Mr. Silvernale sought relief from the provision in the stipulation concerning the children's remaining in their present school system. On October 1, 1982, the respondent presided over a motion

for post-judgment relief to determine whether Mr. Silvernale would be entitled to the physical custody of the children despite the fact that they would be required to attend a different school. Neither party to that proceeding sought to have the entire stipulation and order vacated, and at no time during the hearing did Mr. Silvernale indicate that he would not comply with the stipulation and order if the court denied his request.

When the respondent denied Mr. Silvernale's request, his attorney asked whether it would be acceptable for Mr. Silvernale to live outside the present school district and attempt to maintain the children in their present schools. The attorney assured the respondent that, in any event, his client intended to comply with the terms of the stipulation. At that point in the hearing, the respondent became angry with the attorney for Mr. Silvernale and shouted at him. The respondent then revoked all of Mr. Silvernale's custodial rights under the stipulation and reinstated the "reasonable visitation" provision of the original divorce judgment.

The order vacating the stipulation and order and reinstating the visitation provisions of the original judgment was not requested by either party, nor was the order related to the legitimate considerations before the court at the time. Mr. Silvernale's request to change the terms of a standing order of the court was the proper method by which to seek relief, and at no time did he indicate that he would not honor the previously agreed upon stipulation and order. As a result of the respondent's actions and ruling, Mr. Silvernale continued to experience the same visitation difficulties which preceded the stipulation. It was not until approximately one year later that he again acquired the specific visitation rights provided by the stipulation and order which the respondent had vacated.

**City of Ladysmith v. Mitchell.** The defendant in this civil forfeiture action, charged with operating a motor vehicle while intoxicated-first offense, appeared before a court commissioner and was released on a personal recognizance bond in the amount of $205. When he appeared before the respondent on June 4, 1979, for arraignment, his attorney filed a request for substitution of judge. The respondent then told the attorney, "Well this, of course, is part of your way of doing business! We have now a new method also. We're going to require $300 cash and we'll set the matter for a trial and $300 cash. You want to start dancing we'll dance." The respondent denied the attorney's request for time to post bond. As a result, the defendant was incarcerated for four days, until another judge assigned to the matter reinstated the signature bond.

**Johnson v. Johnson.** An initial order to show cause on a temporary order in this divorce action was scheduled to be heard before the respondent on March 10, 1981. On the preceding day the respondent in the divorce action personally executed and filed a request for substitution of judge, together with a letter from an out-of-county attorney stating that he would be representing the respondent in place of the local lawyer who admitted service on the initial pleadings on behalf of Mr. Johnson. The letter also asked that the hearing on the order to show cause be rescheduled.

On March 9, 1981, Mr. Johnson's new attorney telephoned the respondent, advising him that the substitution request was being filed. He inquired whether the respondent would cancel the hearing on the order to show cause, and the respondent replied that he had not seen the file and did not have time to examine it and that that attorney could appear if he wanted to, but that he did not have to appear.

The attorney traveled to the Rusk County Courthouse

the following day to attend the hearing. During a conference in chambers, in the presence of the attorney, the guardian ad litem, and the attorney for Mrs. Johnson, the respondent loudly berated Mr. Johnson's attorney for the manner in which he practiced law and accused him of unethical behavior. The respondent also told the attorney that in order to obtain future hearing dates, he would be required to personally appear at the county courthouse, notwithstanding that the attorney's office was located in another county, a substantial driving distance away. The respondent then accepted the substitution request and did not hold a hearing on the order to show cause.

**State v. Kafara.** The defendant, charged with burglary and felony theft, was represented by an attorney appointed by the state public defender. The defendant's attorney offered that his client would plead guilty to two misdemeanors, but the prosecutor declined that offer, countering with a recommendation of probation in exchange for guilty pleas to two felonies. No plea agreement was reached.

The matter was tried to a jury on October 1, 1980, and the defendant was found guilty on both felony charges. He and his attorney then discussed the possibility of appeal. In a presentence report subsequently submitted to the respondent, the defendant stated that he had no knowledge of any offer of a probation recommendation from the district attorney's office and that he would have accepted such an offer.

As a result of his convictions, the defendant was placed on probation and assigned to the supervision of a probation agent, to whom he complained about his attorney's alleged failure to convey to him the state's offer of probation. At the agent's suggestion, the defendant put his objections into writing and turned the letter over to the agent, who in turn advised the re-

spondent of the defendant's letter and of the defendant's wish not to appeal his conviction. The respondent then told the agent that he wanted to talk with the defendant.

On or about December 15, 1980, the respondent received a copy of the defendant's attorney's billing to the state public defender's office. Because the bill exceeded $2,000, a copy was required by statute to be submitted to the circuit court for approval. After December 15, 1980, the agent brought the defendant to the respondent's office, where the first of three meetings between the respondent and the defendant took place. All meetings were conducted without the defendant's attorney's knowledge or presence. During those conversations, the respondent and the defendant discussed the prospective appeal and the attorney's bill for services at trial.

On December 29, 1980, the respondent wrote to the office of the state public defender, criticizing the conduct of the attorney in the matter, accusing him of having rejected a plea bargain by which felonies would have been reduced to misdemeanors, criticizing the amount of the bill in light of the services believed to have been rendered, and conveying the defendant's wish not to appeal. A copy of that letter was not provided to the defendant's attorney.

The judicial conduct panel concluded that the respondent's conduct in connection with these seven matters constituted an aggravated and persistent failure to comply with several standards of the Code of Judicial Ethics,[2] thereby constituting a violation of SCR 60.17,[3]

---

[2] Specifically, the panel found an aggravated and persistent failure to comply with the following:

"SCR 60.01(1) A judge should be mindful that ours is a government of law and not of men and should not permit his or her personal concept of justice to override the law. A judge should administer his or her office with due regard to the integrity of the system of law itself, remembering that he or she is not a repository of arbitrary power but a judge under the sanction of law."

and violated SCR 60.11.[4] The panel reported that its recommendation for the removal of the respondent from

"(3) A judge should be temperate, attentive, patient, industrious and, above all, impartial. A judge should administer the law free of partiality and the appearance of partiality. To that end he or she should avoid membership in, or association with, an organization whose objectives, policies or activities are incompatible with the fair and evenhanded administration of justice."

"(6) A judge should be considerate and courteous to litigants, jurors, witnesses, attorneys and all in attendance upon the court. A judge should require similar conduct on the part of clerks, court officials and counsel. He or she should conduct all judicial proceedings so as to reflect the importance and seriousness of the inquiry to ascertain the truth."

"(9) A judge should conduct the work of his or her court with dignity and decorum and without interference which might detract from the proper courtroom atmosphere. A judge should so act during trials and hearings that his or her attitude, manner or tone toward counsel or witnesses will not prevent the proper presentation of the cause or the ascertainment of the truth. A judge may properly intervene if he or she considers it necessary to clarify a point or expedite the proceedings. He or she should not make an unnecessary display of learning, express a premature judgment or add to the embarrassment or timidity of witnesses or counsel."

"(10) A judge should always bear in mind the need of scrupulous adherence to the rules of fair play. A judge should not permit private interviews, arguments, briefs or communications designed to influence his or her decision. A judge should not act upon ex parte applications unless the necessity for prompt action is clearly shown, granting relief only when fully satisfied that the law permits it and the emergency requires it."

"(11) A judge should grant to all parties the opportunity to present, by a full and fair record or transcript, questions exactly as they are presented and determined. In disposing of contested cases a judge should indicate the reasons for his or her action."

"(12) A judge should not seek to be extreme, peculiar, spectacular or sensational in his or her judgment or in his or her conduct of the court. A judge should not compel persons brought before him or her to submit to discipline of his or her own devising without authority of law. In imposing sentence he or she

the position of circuit judge was based principally upon the conduct in *Eades, Towers, Mitchell,* and *Silvernale,* "in which cases a party directly suffered the loss of liberty or a substantive right as a result of the respondent's misconduct."

Of the four types of discipline for judicial misconduct provided by the Wisconsin Constitution[5]—reprimand, censure, suspension, and removal—the panel's findings and conclusions, amply supported by the record and not disputed by the respondent, establish judicial misconduct warranting the most severe. Were it not for the fact that he has retired from the office of circuit judge for Rusk county, we would order his removal from that office.

However, the respondent's retirement from judicial office prior to the termination of this disciplinary proceeding does not insulate him from discipline for his misconduct while in office. *In the Matter of the Complaint Against Raineri,* 102 Wis. 2d 418, 306 N.W.2d 699 (1981). Because the respondent would otherwise be eligible to serve as a reserve judge on temporary assign-

should not seek popularity or publicity by exceptional severity or undue leniency."

[3] SCR 60.17 provides: "**Rule violation.** An aggravated and persistent failure to comply with the standards of SCR 60.01 is a rule violation."

[4] SCR 60.11 provides: "**Influence.** A judge shall not, directly or indirectly, lend the influence of his or her name or the prestige of his or her office to aid or advance the welfare of any private business or permit others to do so. A judge shall not personally solicit funds for any purpose, charitable or otherwise."

[5] Art. VII, sec. 11, provides: "**Disciplinary proceedings.** Each justice or judge shall be subject to reprimand, censure, suspension, removal for cause or for disability, by the supreme court pursuant to procedures established by the legislature by law. No justice or judge removed for cause shall be eligible for reappointment or temporary service. This section is alternative to, and cumulative with, the methods of removal provided in sections 1 and 13 of this article and section 12 of article XIII."

ment, sec. 753.075 (2), Stats., we remove him, for cause, from eligibility to serve in that judicial office. As a consequence, he is also constitutionally ineligible for re-appointment or temporary service as a judge. Art. VII, sec. 11, Wis. Const.