# IN the MATTER OF JUDICIAL DISCIPLINARY PROCEEDINGS AGAINST the Honorable Ralph G. GORENSTEIN, Reserve Circuit Court Judge.

Supreme Court

*No. 88–0549–J. Submitted on briefs December 1, 1988.— Decided February 2, 1989.*

(Also reported in 434 N.W.2d 603.)

For the Honorable Ralph G. Gorenstein, there was a brief by *John D. Murry* and *Habush, Habush & Davis, S.C.,* Appleton.

For the Wisconsin Judicial Commission there was a brief by *Frank M. Tuerkheimer, LaFollette & Sinykin,* and *Elena A. Cappella,* Madison.

PER CURIAM. *Judicial disciplinary proceeding; judge suspended from office.*

We review, pursuant to sec. 757.91, Stats., the findings of fact, conclusions of law and recommendation of the judicial conduct panel that Ralph G. Gorenstein be suspended from the office of judge and prohibited from exercising the powers and duties of a judge for a period of two years as discipline for misconduct. The panel concluded that Judge Gorenstein wilfully and on an aggravated and persistent basis violated six of the standards set forth in the Code of Judicial Ethics by statements he made during the course of proceedings before him as circuit judge for Milwaukee county.

Between January 1981 and February 1987 Judge Gorenstein did the following. He berated black women with minor children appearing before him on probation status reviews for what he viewed as a wholesale abuse of the welfare system in Milwaukee by blacks who had illegitimate children and who did not want to work. He told public defenders they would or should go to jail if their clients failed to make restitution. He made intemperate remarks about appellate courts, as set forth below. He criticized a victim-witness, out of the presence of the jury, for crying during cross-examination. Upon learning that a defendant's probation had been revoked, he directed the man's lawyer to seek review of that decision, told him on what grounds to do so, offered to extend any time limits if necessary and said he would decide the case by putting the man back on probation. In three cases in which persons

associated with a state mental health hospital testified as expert witnesses, Judge Gorenstein criticized that facility, stating that he had never found a doctor or any staff person associated with it to be qualified and that he had no faith in any of the state hospitals, despite the fact, as he later acknowledged, that he knew those statements were untrue.

The panel concluded that Judge Gorenstein violated on an aggravated and persistent basis several of the standards to which judges are held by permitting his personal concept of justice to override the law, administering his office without due regard to the integrity of the legal system, being intemperate and impatient. The panel further concluded that he failed to respect expressions of judicial opinion and cooperate with appellate judges as members of a common judicial system, being inconsiderate and discourteous to litigants, witnesses, attorneys and others in court, failing to conduct the work of his court with appropriate dignity and decorum, failing to act during proceedings so that his attitude, manner or tone toward counsel or witnesses would not prevent the proper presentation of the case or the ascertainment of the truth, expressing a premature judgment, adding to the embarrassment of witnesses and counsel and threatening to impose sentences not authorized by law.

Accepting the panel's findings and conclusions, we determine that the recommended sanction constitutes appropriate discipline for Judge Gorenstein's misconduct. Accordingly, we suspend him from the office of judge and prohibit him from exercising any of the powers or duties of a judge in the state of Wisconsin for a period of two years.

While all of the conduct before us had occurred when he was serving as circuit judge for Milwaukee

county, Judge Gorenstein retired from that office on July 31, 1987. Thereafter, he remained eligible to serve and in fact served as reserve judge in the circuit court. However, the date this disciplinary proceeding was filed, he removed himself from eligibility under the court rules for reserve judge service.*

Although he has not previously been the subject of a judicial disciplinary proceeding, Judge Gorenstein received a private admonition from the Judicial Commission of Wisconsin in 1985 for having made "inappropriate comments" from the bench.

In this proceeding, Judge Gorenstein stipulated to the allegations of misconduct set forth in the complaint of the Judicial Commission. Accordingly, the judicial conduct panel, consisting of Court of Appeals Judges Thomas Cane, Daniel LaRocque and Gordon Myse, presiding judge, made the following findings of fact in respect of the matters in which Judge Gorenstein made the statements complained of.

(1) On February 5, 1987, during a review of the probation status of a black woman, in response to a statement of the woman's attorney concerning her client's difficulty in visiting five places per day to find work because she had a minor child at home, Judge Gorenstein stated:

---

*Supreme Court Rule 70.35 requires that, to be eligible for appointment and assignment as a reserve judge, a person otherwise eligible under sec. 753.075, Stats., must have earned four credits of continuing judicial education during the 12 months immediately preceding appointment and have on file with the court a written consent to eligibility for appointment as reserve judge, which must be renewed annually. When a person's consent to eligibility is withdrawn, it may not be refiled for a period of six months from the effective date of withdrawal. Judge Gorenstein withdrew his consent to eligibility, effective March 18, 1988.

I am sick and tired of supporting people. Seventy-five percent of the black people in Milwaukee are illegitimate. This woman has three illegitimate kids. I don't want to support her kids. You can do it. It's become a way of life here. I am not tolerating it any more. You tolerate it. Seventy-five percent to eighty percent, Miss Harwich, of the people I see in court are born illegitimate and black and come from welfare families; and I pay for this courtroom and the staff and I am sick of it and so is the rest of Wisconsin. And that's why [Governor] Tommy Thompson got elected and not Giveaway Earl. [To the client] Lady, go to work or you are going to jail. The days of the 60's handouts are out. You go to work or you go to jail.

(2) On January 29, 1987, in another probation status review, while determining whether the probationer had made a good faith effort at obtaining work, the following was said:

THE COURT [Judge Gorenstein]: It's the old welfare syndrome that's the problem, Ms. Harwich [defendant's attorney]. People get comfortable earning—if you look at it and start adding it up, I don't know what kind of income she gets. She gets five hundred some dollars a month from welfare. She gets $506 a month from AFDC, $132 a month in food stamps. She's earning, in other words, $632 a month free and clear. She doesn't want to work. It's trading dollars. So she doesn't want to better herself. She would rather stay on the welfare udder rather than getting a job. It's the same old problem. When you're on probation I don't think that's acceptable.

MS. HARWICH: Judge, I think you're making a sweeping conclusion which is totally contrary to the report. The report very clearly spells out

865

that she was employed by Cutler-Hammer. I believe prior reports indicate that after she was fired because of this incident she suffered a great deal of financial setbacks. This was in and out in terms of unemployment—or the legality of the firing, I guess, was challenged. It went back and forth. There was a dispute over that. I don't know what the final outcome was other than the fact that she was never reinstated.

She made other attempts to get jobs. She did find one at Kohl's Food Store. As Mr. Zangle indicated, she wasn't—the amount of money she had to put out in order to go to her job made her actually lose money by doing that. But, nonetheless, she did do it.

THE COURT: In other words, she doesn't have any self-pride that she would rather work and support herself than take welfare money?

MS. HARWICH: That's not the point, Judge. I think at issue are two young children that she has sole responsibility for, and I don't see how on this record this Court can make any finding other than the fact that she has made a good faith effort.

THE COURT: Do you have any other evidence?

The Court finds that she has not made a good faith effort; in fact, she's made a couple of aborted efforts. And in the last two years since the extension she's basically done nothing when her kids were of an age when she could have gone out and found work, and it's the classic old problem making too much on welfare, not enough pride.

The Court's going to find that she has not made a good faith effort—in fact, find she's made almost no effort in the last two years, and very little effort before then, and extend her for two years.

In addition to the welfare grant the reduction will be $100 a month. It's going to sting a little bit. Give her some incentive to get off.

MS. HARWICH: Your Honor, in terms of your attempting to punish her what you're doing is punishing two children 6 and 12.

THE COURT: The 12–year old can go out and get a paper route, the 6–year old can help at home a little bit, and she can go out and get work, maybe two or three jobs, provide a home environment where welfare is not the accepted living.

THE DEFENDANT: May I speak for a second?

THE COURT: Sure.

THE DEFENDANT: I would like to say when my youngest one was at home and not in school I volunteered to go to W.E.O.P. voluntary. It wasn't that the welfare said it's time for you to go to W.E.O.P. I decided to do it.

I worked at Kohl's Food Store. They gave me fifteen to twenty hours a week at $4.20. I was getting $506 from welfare. She dropped me from 506 with no food stamps and $273, and I had to pay rent, gas and light, telephone, plus buy food.

THE COURT: Yeah. And the people of the State of Wisconsin and the people of the United States owe you $506 a month—

THE DEFENDANT: And I'm not afraid to work.

THE COURT: —for the rest of your life? I should support you for the rest of your life, right, rather than you working?

THE DEFENDANT: I have worked.

THE COURT: So you can sit at home and watch television and have fun with your kids?

Lady, get out of here before I throw you in jail. I'm sick of it.

And you know who the kids I see in here committing crimes? Kids whose parents are on welfare, because they don't have anything to do either. They figure they would rather be on welfare than work, so they go out and commit burglaries and steal cars and hold up Open Pantries.

MS. HARWICH: Your Honor, I think that's an unfair indictment of this woman.

THE COURT: Baloney. It's an indictment of the whole social system.

A hundred dollars a month deduction.

MS. PARTIPILO [from Dept. of Health and Social Services]: Your Honor, are you ordering the welfare to make that deduction?

THE COURT: I'm ordering the welfare department to deduct $100 a month until it's paid.

MS. PARTIPILO: May I prepare something for you to sign?

THE COURT: Yeah.

MS. HARWICH: Your Honor, would the Court order a stay on that hundred-a-month deduction pending appeal?

THE COURT: No. Let those saps on the sixth floor [where the office of District I of the Court of Appeals is located] and in Madison [where the Supreme Court is located] liberals do it if they want to. Go run on that record.

(3) On December 10, 1986, in a case brought by the state public defender seeking a sentence reduction, Judge Gorenstein said:

THE COURT: Favorably disposed? I'm angry about [the motion for sentence modification] on behalf of my paying taxes, that a guy with fifty-four violations, or fifty, or forty-five, or forty, is—I

spent two thousand dollars bringing him back here and thousands and thousands of dollars on appeal.

I'm going to let you [the public defender] make your record, but I hope you find another job. I don't want you spending my tax dollars on a guy like Franklin. I read that presentence and I couldn't believe it, that any responsible attorney and any appellate court would, number one, reverse the case; number two, bring it back here and spend this kind of money on a guy who has had fifty-four violations, including riots. Who shot a police officer.

(4) On November 9, 1985, on a motion for a new trial on the ground that the sentencing procedure had been defective and that the defendant's *Miranda* rights had been violated, Judge Gorenstein, in discussing the rule requiring suppression of illegally or improperly obtained evidence, said:

The suppression rule must be changed; and I am talking to the hypocrites in the Appellate Court and Supreme Court, because I have seen the decisions that come down. They bend the rules until they almost break them, then they bend the law .... And to argue all this stuff frankly—if the boys upstairs [referring to the Court of Appeals] don't like it and if the boys and girl in Madison [referring to the Supreme Court] don't like it, if they have got the guts to reverse this case on a lot of technical things, let them do it, and I will run against the first judge that reverses this case.

(5) On March 27, 1985, in a probation review case in which the defendant had paid just over one-fourth of the restitution ordered by the court, Judge Gorenstein asked whose responsibility it was to make restitution, to which the defendant replied that it was

hers. The judge then said, "Your husband is a bum, your kids don't want to work, that's not the victim's responsibility." When he then asked how old the defendant's children were, the defendant responded that she had only one child, who was not yet five years old.

(6) During cross-examination in a second-degree sexual assault case, Judge Gorenstein said the following to the alleged victim, out of the presence of the jury:

> THE COURT: Now sit down, stop crying. Mr. Udovc's questions have been far from probing. His tone of voice is less harsh than mine is now. I think the female response to [*sic*] crying to any tough situation is inappropriate in a courtroom.
>
> You collect yourself and conduct yourself as a mature adult or I'm going to dismiss this case for being overly prejudicial. It's prejudicial to the defendant in this case for you to sit there and bawl your eyes out at these questions. We had a victim who underwent a lot more than you did last week and she sat there and answered the questions in a business-like, straightforward answer-like way, and I think you can do the same thing.
>
> Now collect yourself, conduct yourself like an adult, please.

(7) On January 24, 1984, when he learned that the probation of a man appearing before him had been revoked by the Department of Health and Social Services for specified reasons, Judge Gorenstein directed the man's lawyer to file a writ of certiorari to obtain judicial review of that revocation, told him on what grounds to bring the writ, said he would extend any time limits that might have expired and stated how he would rule on the writ, saying, "I am going to

reverse them and put him back on probation." Under applicable statutes and regulations, however, a court reviewing a probation revocation is not permitted to substitute its judgment for that of the agency; it must decide only whether the revocation decision was arbitrary or capricious. Here, expressing incredulity that the probation had been revoked, the judge also stated that "what they should do is fire the probation officer."

(8) On January 17, 1984, in a review of the probation status of a man who had been ordered to make restitution, the judge instructed the man to make restitution and told the probation officer that if the man did not do so, the probation officer would also find himself in jail. In a similar case on the same day, the judge told the probation officer, "I'd like to send you [to jail] along with [the probationer]."

(9) On January 31, 1981, December 13, 1983, and May 17, 1984, in three separate cases, the judge made statements expressing his opinion that there were no qualified doctors or staff at the Winnebago Mental Health Hospital, each time in response to expert testimony of doctors from that hospital, even though he knew or should have known, based on his own experience, that those statements were false.

In addition to stipulating to these facts, Judge Gorenstein stipulated that his conduct violated the following standards of the Code of Judicial Ethics, SCR 60.01:

> (1) ... A judge should administer his or her office with due regard to the integrity of the system of law itself, remembering that he or she is not a repository of arbitrary power but a judge under the sanction of law.

871

(3) A judge should be temperate, attentive, patient, industrious and, above all, impartial. A judge should administer the law free of partiality and the appearance of partiality. ...

(5) A judge should cooperate with other judges as members of a common judicial system to promote the satisfactory administration of justice. A judge should respect all expressions of judicial opinion.

(6) A judge should be considerate and courteous to litigants, jurors, witnesses, attorneys and all in attendance upon the court. ...

(9) ... He or she should not ... express a premature judgment or add to the embarrassment or timidity of witnesses or counsel. ...

(12) A judge should not seek to be extreme, peculiar, spectacular or sensational in his or her judgment or in his or her conduct of the court. A judge should not compel persons brought before him or her to submit to discipline of his or her own devising without authority of law. ...

Because of the number and nature of the judge's statements and also because he had previously been admonished for making inappropriate statements from the bench, the judicial conduct panel concluded that Judge Gorenstein's violation of these standards was aggravated and persistent, thereby constituting a violation of a rule of judicial ethics, to wit, "An aggravated or persistent failure to comply with the standards of SCR 60.01 is a rule violation." SCR 60.17. Because the panel also concluded that the violations were wilful, that is, freely made and not the result of duress or coercion, they constituted judicial misconduct, defined under sec. 757.81(4)(a), Stats., as a "wilful violation of a rule of the code of judicial ethics."

The only issue presented by the parties in this review is the discipline to be imposed for Judge Gorenstein's misconduct. The Judicial Commission sought his permanent removal from eligibility for reserve judge service; although his counsel had argued to the panel that a prohibition from reserve judge service for a period of six months to one year would be appropriate discipline, in this review Judge Gorenstein took the position that a public reprimand would be sufficient.

The purpose of judicial discipline is to protect the court system and the public it serves from unacceptable judicial behavior. The discipline to be imposed, then, is to be determined by the extent of the protection needed, based upon the seriousness of the judge's misconduct and the likelihood that it would recur. Here, Judge Gorenstein has demonstrated his present unfitness to serve as a member of the judiciary. That he lacks the necessary judicial temperament is evidenced by his pattern of expressing insensitivity and disrespect toward litigants, witnesses, prosecutors and other courts in our judicial system. Moreover, he routinely displayed that lack of judicial temperament from the bench in open court.

In disciplining Judge Gorenstein for his misconduct, it is not our intention to interfere with his or any judge's exercise of the freedom of thought or expression, provided it does not adversely affect the orderly workings of our courts in their efforts to provide justice to the citizens of Wisconsin. While the expression of a judge's thoughts, perceptions and opinions in another context may be acceptable, the same expression may become unacceptable, to the extent of constituting judicial misconduct, when it occurs in a

judicial proceeding. The public expression of a judge's personal beliefs from the bench in the judge's official capacity takes on the nature of official conduct and becomes the object of scrutiny and, when warranted, discipline by this court in the exercise of its constitutional responsibilities to the court system and to the public

In the matter before us, Judge Gorenstein repeatedly allowed his personal perceptions to interfere with his responsibilities as a judge. For example, he ascribed character traits to people appearing before him based on statistical and other information he had obtained from newspapers and other sources, thus denying those litigants the treatment as individuals they were entitled to receive from the court.

A plaintiff, a defendant or a witness comes before the court as an individual, responsible as an individual for his or her conduct. Defendants are not on trial as members of a race or of an ethnic group. A judge's references to race or ethnicity that seem to stigmatize individuals appearing before the judge are not acceptable.

Regardless of the accuracy of the information on which Judge Gorenstein based his views, his treatment of litigants, witnesses and others appearing in his court evinced a failure to understand or accept the duty of a judge to afford every person fair and impartial treatment. That understanding is so fundamental to a judge as to render its absence ground for serious discipline.

Because Judge Gorenstein has demonstrated that he lacks the fitness to serve in our courts as a judge, we determine it appropriate that he be suspended from so serving. The length of that suspension is measured not only by the gravity of his misconduct,

but also by the fact that, after having been privately admonished by the Judicial Commission for making inappropriate comments from the bench, he was unable or unwilling to modify his behavior. A two-year suspension from service as a judge in our courts should provide the public and the court system the protection it needs from such misconduct and, at the same time, should impress upon Judge Gorenstein the seriousness of his misconduct and the necessity that he correct his behavior should he ever again seek to occupy a judicial position.

IT IS ORDERED that Ralph G. Gorenstein is suspended from the office of judge and prohibited from exercising the powers and duties of a judge for two years, commencing the date of this order.