IN the MATTER OF JUDICIAL DISCIPLINARY PROCEEDINGS AGAINST the Honorable Louise M. TESMER, Circuit Judge, Milwaukee County.

Supreme Court

*No. 97–1088–J. Oral argument May 28, 1998.—Decided July 1, 1998.*

(Also reported in 580 N.W.2d 307.)

For the Honorable Louise Tesmer, there were briefs by *Ralph A. Weber* and *Reinhart, Boerner, Van Dueren, Norris & Rieselbach, S.C.*, and *Matthew T. Fricker* and *Kravit & Gass, S.C.*, all of Milwaukee and oral argument by *Ralph A. Weber* and *Matthew T. Fricker.*

For the Wisconsin Judicial Commission there was a brief by *Frank M. Tuerkheimer* and *LaFollette & Sinykin* and *James C. Alexander* and *Wisconsin Judicial Commission*, all of Madison, and oral argument by *Frank M. Tuerkheimer.*

¶ 1.  PER CURIAM.  This is a review, pursuant to Wis. Stat. § 757.91,[1] of the findings of fact, conclusions of law and recommendation for discipline of the judicial conduct panel concerning the conduct of the Honorable Louise M. Tesmer, circuit judge for Milwaukee county. The panel, by a divided vote, concluded that Judge Tesmer engaged in judicial misconduct by having a friend, who is a law professor, prepare for her use opinions on dispositive motions in cases over which

---

[1] Section 757.91 provides:

**Supreme court; disposition.** The supreme court shall review the findings of fact, conclusions of law and recommendations under s. 757.89 and determine appropriate discipline in cases of misconduct and appropriate action in cases of permanent disability. The rules of the supreme court applicable to civil cases in the supreme court govern the review proceedings under this section.

she presided. The panel majority concluded that the judge thereby wilfully violated two rules of the former Code of Judicial Ethics:[2] one prohibiting a judge from permitting on an aggravated or persistent basis private communications designed to influence the judge's decision; the other proscribing a judge's initiating, permitting, engaging in or considering ex parte communications concerning a pending matter. As discipline for that judicial misconduct, the panel majority recommended that Judge Tesmer be reprimanded.

¶ 2.    We determine that Judge Tesmer's ongoing and persistent discussions of dispositive motions in cases pending before her with a person unconnected with the judicial system, even though disinterested in the pending matters, and her use of his assistance to draft opinions in those matters violated the prohibition of private communications designed to influence a judge's decision. Those discussions and her friend's participation in the preparation of opinions continued for three years, over which time he drafted opinions in at least 32 cases. While the panel majority found that Judge Tesmer had a good faith belief that her conduct did not violate the Code, a finding we adopt, we agree with the panel majority that she should have known that it constituted a violation of the rule prohibiting private communications. Consequently, and as it did not result from duress or coercion, Judge Tesmer's conduct was "wilful," so as to constitute judicial misconduct under Wis. Stat. § 757.81(4)(a).[3]

---

[2] Except where otherwise noted, Code references are to the Code of Judicial Ethics, SCR ch. 60, in effect between 1993 and 1997, the time relevant to this proceeding.

[3] Section 757.81(4)(a) provides:

(4)   "Misconduct" includes any of the following:
    (a)   Wilful violation of a rule of the code of judicial ethics.

¶ 3.   We do not conclude, however, as the panel majority did, that Judge Tesmer's conduct was also a wilful violation of the proscription of a judge's ex parte communications concerning pending matters.   We agree that the communications Judge Tesmer had on an ongoing basis with her law professor friend were "ex parte," but we determine that her violation of the proscription was not wilful, in that she is not chargeable with having known that they violated that rule of the Code.

■

¶ 4.   Because there was no evidence, nor had it been alleged, that Judge Tesmer's use of her friend's assistance caused actual harm to any of the parties in pending matters or that someone other than Judge Tesmer made the decisions on the substantive motions and in light of her belief that her conduct was not proscribed by the Code of Judicial Ethics, we determine that the appropriate discipline to impose for her judicial misconduct is a reprimand. That is the least severe of the four forms of discipline we are constitutionally authorized to impose.[4]

¶ 5.   Pursuant to customary procedure, we afforded the parties the opportunity to file briefs and, at Judge Tesmer's request, held oral argument on the panel's report. Judge Tesmer contested one of the panel's factual findings and its conclusions that she violated two rules of the Code of Judicial Ethics. She also objected to the panel's recommendation of discipline. The Judicial Commission contested only the

---

[4] Wis. Const. Art. VII, sec. 11 provides, in pertinent part:

"Each justice or judge shall be subject to reprimand, censure, suspension, removal for cause or for disability, by the supreme court pursuant to procedures established by the legislature by law."

disciplinary recommendation, taking the position that the seriousness of her judicial misconduct warrants Judge Tesmer's suspension from judicial office for six months.

¶ 6. The judicial conduct panel consisted of three judges of the Court of Appeals — the Honorables Neal Nettesheim, Gordon Myse, and Charles Dykman, who presided. Judge Tesmer and the Judicial Commission entered into a stipulation of facts, based on which and on evidence presented at a hearing the panel made findings of fact to the requisite clear, satisfactory and convincing burden of proof as follows.[5]

¶ 7. Judge Tesmer, first elected circuit court judge in 1989, was rotated to the large claims part of the civil division of the circuit court for Milwaukee county in 1993. At that time, it was the practice of the judges handling large claims cases to render decisions on dispositive motions in those cases each Monday. During the time relevant to this disciplinary proceeding, August, 1993 through July, 1996, Judge Tesmer was responsible for the resolution of at least 350 dispositive motions. Her usual practice for handling dispositive motions was the following.

¶ 8. A week before the scheduled hearing date, Judge Tesmer directed her law clerk to prepare a memorandum and recommended disposition for each dispositive motion. The law clerk, a county employee, was to complete the memorandum, including a draft explanation of the disposition recommended, before noon on the Friday preceding the hearing. Judge Tes-

---

[5] Notwithstanding that the panel reported its factual findings as having been made "unanimously," in his dissent to the report, Judge Dykman appeared to reject at least one of those findings — that Judge Tesmer's friend recommended analyses and dispositions to Judge Tesmer.

mer began her review of the dispositive motions scheduled for a Monday during the afternoon of the preceding Friday. She took the files home with her on Friday afternoon, including the parties' briefs, the clerk's memoranda and at times relevant case law and statutes. She continued her review of the files on Saturday morning.

¶ 9. Professor John McCormack, a tenured faculty member of the University of Loyola Law School in Chicago and a longtime, close friend of Judge Tesmer, regularly visited her in the Milwaukee area. He was not a court employee or part of an accepted or approved judicial internship program. When he arrived at her home mid-morning on Saturday, Judge Tesmer gave Professor McCormack case files on certain matters that were awaiting resolution the following Monday and had him prepare drafts of opinions she could read from the bench at the hearings. At times, in the morning of the Monday set for hearing, Judge Tesmer gave her court reporter textual material to be typed as the proposed opinion in the matter.

¶ 10. At some point after 1994, Judge Tesmer became dissatisfied with the quality of her law clerk's memoranda. Although she had no independent recall of when she first used Professor McCormack's assistance, there was evidence of one instance in 1993 and one in 1994. The frequency increased significantly in 1996, during the first six months of which he assisted on 21 motions. From August, 1993 to June, 1996, he was involved in at least 32 dispositive motion matters.

¶ 11. All conversations between the judge and Professor McCormack concerning work on pending matters were confidential, and no notice was given to any of the parties in those matters of those conversations or of Professor McCormack's assistance.

Professor McCormack had no interest in any of the cases on which he provided assistance, was not acquainted with any litigant, counsel for a litigant, witness, or anyone else involved in any case on which he assisted, and had no interest in the outcome of any of those matters. He did not inject any extraneous factual matter into the draft opinions he prepared; those drafts reflected only the facts that had been presented by the parties. It was not contended that he benefited from the assistance he gave Judge Tesmer.

¶ 12. When she asked for his assistance on a motion, Judge Tesmer would provide Professor McCormack the clerk's memorandum and the parties' briefs, tell him whether she was going to grant or deny the motion, and state the "fundamental basis" for her decision. In some cases, she told him she was not comfortable with some aspect of the clerk's work and asked him to rework the clerk's analysis. In other cases, she would direct his attention to a particular portion of a party's brief and tell him to use the brief's analysis as the basis of the opinion. Professor McCormack did not take any notes during his discussions with the judge.

¶ 13. Prior to her discussions with Professor McCormack, Judge Tesmer was fully conversant with the parties' submissions and the relevant facts. Professor McCormack never worked on a motion without first discussing it with the judge and receiving instruction as to the outcome and the rationale. In drafting an opinion, he would begin with the "fundamental rationale" identified by Judge Tesmer, and if he felt that additional analysis was necessary, he would discuss his concerns with her.

¶ 14. Judge Tesmer reviewed Professor McCormack's work to ensure that it was consistent with her

decision, and she retained final decisional authority in each case. There was no evidence, nor had it been alleged, that Judge Tesmer abdicated her decision-making authority to Professor McCormack. Judge Tesmer never told any of her colleagues on the circuit court of the assistance she was receiving from Professor McCormack. She had a "good faith belief" that his assistance was permitted under the Code of Judicial Ethics. She and Professor McCormack viewed his role as akin to a law clerk's.

¶ 15. The panel, with the apparent exception of Judge Dykman, found that Professor McCormack was "more than a scrivener" and that he participated in the decision-making process and discussed, evaluated, and recommended analyses and dispositions to Judge Tesmer as part of his participation. In addition, the panel found that he "influenced" the judge on the issues he worked on.

¶ 16. We note here and discuss below Judge Tesmer's contention that the finding that Professor McCormack participated in the decision-making process on each case he worked on and discussed, evaluated, and recommended analyses and dispositions to her as part of his participation in her work on the pending motions was clearly erroneous. She did not contest the finding that he "influenced [her] on the issues on which he worked."

¶ 17. Based on those facts, the panel majority concluded that Judge Tesmer's use of Professor McCormack to assist her in the preparation of opinions on dispositive motions was an "aggravated or persistent failure" to comply with the standard set forth in former SCR 60.01(10):

> A judge should always bear in mind the need for scrupulous adherence to the rules of fair play. A

716

judge should not permit private interviews, arguments, briefs or communications designed to influence his or her decision.

It specifically pointed to Professor McCormack's discussions of pending cases, his modification of law clerk memoranda and all or part of the judge's opinions, and the incorporation of written material he drafted into the judge's decisions as violating that rule. Because her failure to comply with that standard extended over a period of nearly three years and because Professor McCormack's participation was significant and increased noticeably in the months preceding the Judicial Commission's notification to her of its concern, the panel majority concluded that her violation of the standard was "persistent" and therefore constituted a violation of a rule of the Code of Judicial Ethics:[6] The panel majority concluded further that Judge Tesmer should have known that Professor McCormack's involvement in her judicial decision making was prohibited by the Code.

¶ 18. The panel majority also concluded that Judge Tesmer's discussions with Professor McCormack constituted "ex parte communications" concerning pending actions or proceedings within the meaning of SCR 60.20(1)[7] and violated that rule of the Code. The panel majority rejected as overly restrictive Judge Tesmer's contention that "ex parte communications" are

---

[6] Under the former Code, "An aggravated or persistent failure to comply with the standards of SCR 60.01 is a rule violation." SCR 60.17.

[7] SCR 60.20 provided, in pertinent part:

**Ex parte communications.**

(1)  A judge shall not initiate, permit, engage in or consider ex parte communications concerning a pending or impending action or proceeding [with exceptions not pertinent here].

limited to a judge's communication with a *party* to a proceeding out of the presence of the other party or parties. Noting non-party contacts by judges that have been held to be prohibited, the panel majority suggested that Professor McCormack's assistance created the possibility that "extraneous matters may be injected into the trial process without the knowledge or consent of the parties, thereby jeopardizing the fundamental fairness of the proceeding."

¶ 19. The panel majority concluded that Judge Tesmer's violation of the ex parte communication prohibition was "wilful," as that term is used in the statutory definition of "judicial misconduct." In that respect, the panel majority concluded that Judge Tesmer freely engaged in the communications with Professor McCormack, her conduct did not result from duress or coercion, and she should have known that those communications were not permitted by the Code.

¶ 20. In recommending that Judge Tesmer be reprimanded for her judicial misconduct, the panel majority considered the nature of the misconduct and the impact it had on the judicial system. It specifically noted that Judge Tesmer retained control over the decisional process, did not abdicate her decision-making responsibility, and controlled the outcome and the choice of supporting rationale in each case. It acknowledged that she was motivated by a desire to provide litigants with well-crafted opinions and held a good faith belief that Professor McCormack's contributions to her opinions were no different than the contributions of a regularly employed law clerk.

¶ 21. Judge Dykman dissented from the majority's conclusions that Judge Tesmer's conduct violated the Code of Judicial Ethics. In addition, he stated in his dissent that there was no testimony to support the

majority's factual finding that Professor McCormack recommended analyses and dispositions to Judge Tesmer. Contrary to the majority's statement that Professor McCormack was not subject to the same control and scrutiny as is a regularly employed law clerk, Judge Dykman asserted that Professor McCormack was subject to control and scrutiny based on the facts that Judge Tesmer knew what he was doing, reviewed his work, and sometimes changed her mind and rejected work he had done for her. Judge Dykman also expressed difficulty in differentiating between the assistance Professor McCormack provided to Judge Tesmer and the assistance judges receive from unpaid judicial interns provided through law school programs. He found no evidence to support the majority's view that, unlike law clerks or judicial interns, litigants did not expect that Professor McCormack would be drafting language Judge Tesmer used in resolving legal questions.

¶ 22. On the issue of whether Judge Tesmer's conduct violated the rules of the Code of Judicial Ethics, Judge Dykman considered the purpose of the two specified rules to be to assure fairness, concluding that in order to be prohibited by SCR 60.01(10), private interviews, arguments, briefs or communications "must somehow affect how the public views a judge's conduct." Noting the absence of testimony concerning what litigants expect regarding judicial assistance or how the public views the type of assistance Professor McCormack provided, Judge Dykman expressed disagreement with any assumption that the public would view unbiased and uninterested help in drafting language for judicial decisions as unfair to the litigants.

¶ 23. Finally, Judge Dykman concluded that the two rules did not sufficiently identify the type of con-

duct they prohibited, pointing out that no one reasonably could expect them to be interpreted literally, as they would prohibit a judge from having a communication about a pending case with a law clerk, secretary, legal intern, or judicial colleague. In his view, the rules did not prohibit assistance by disinterested persons skilled in legal writing, whose only involvement was to assist a judge in putting decisions in proper form.

¶ 24. In this review, Judge Tesmer argued that the panel majority's finding that Professor McCormack "participated in her decision-making process" and "recommended analyses and dispositions as part of his participations" is clearly erroneous, contending that there was no evidence to support that finding. She also asserted that the finding led directly to the panel majority's conclusion that she engaged in private communications designed to influence her decision, thereby rendering that conclusion improper.

¶ 25. In support of her contention, Judge Tesmer relied on several other panel findings in respect to Professor McCormack's participation in the drafting of opinions on dispositive motions: he never worked on a motion without first discussing it with and receiving instruction from her as to outcome and rationale; there was no evidence she abdicated her decisional authority to him; she reviewed his work product to ensure that it was consistent with her decision; she retained final decisional authority in each case. Judge Tesmer also cited one instance in which she initially had decided to deny a summary judgment motion but after instructing Professor McCormack as to the outcome and rationale for that decision and following his preparation of a draft opinion supporting it, she changed her mind and

drafted a new opinion herself, which she issued orally from the bench, granting the motion.

¶ 26. Judge Tesmer also sought to distinguish between her "decisions" and the "opinions" that explained the rationale for them. She asserted that SCR 60.01(10) did not address communications that influenced merely a judge's opinion but was limited to those that influenced a judge's decision. Judge Tesmer insisted that there was no evidence in the record that Professor McCormack participated in her *decision*-making process.

¶ 27. We find no merit in the distinction Judge Tesmer urged for purposes of the rule prohibiting a judge's private communications designed to influence a judge's decision. Both the judge and Professor McCormack testified that they viewed his work for her as essentially that of a law clerk, which Judge Tesmer described as discussing, evaluating and recommending analyses and dispositions to judges as a matter of their regular employment. She also testified that Professor McCormack helped her in developing her rationale and that in her discussions with him he would ask whether she thought of something, and if she had not, it could be added. For his part, Professor McCormack testified that he felt free to suggest alternative rationales, and if Judge Tesmer accepted them, they were incorporated into the opinion. He said he felt free to advise if he thought the law clerk's rationale did not lead to the conclusion she sought, and if he thought her conclusions were wrong, he would point that out to her, and if she agreed, he would rewrite the opinion.

¶ 28. The fact that Professor McCormack did not discuss with Judge Tesmer what decision she should reach in each of the cases he worked on does not undermine the finding that he participated in the decision-

making process. Professor McCormack's testimony is clear that when he arrived at her home on Saturday mornings, Judge Tesmer would tell him about the case she wanted him to work on and, in his words, "...would tell me her *tentative* outcome on the case...[and] would suggest rationales, sometimes by pointing to the parties' briefs." (Emphasis supplied.) He testified further that when she told him the tentative outcome and rationale she had reached, her final outcome and rationale had not yet been determined. He stated that he would have discussions with her regarding both the outcome and the rationale of a case, although she would be the "ultimate determinative factor" in what was going to be included in her opinion.

¶ 29.  We reject Judge Tesmer's contention that the panel majority's finding that Professor McCormack participated in her decision making and discussed, evaluated, and recommended analyses and dispositions to her as part of that work is clearly erroneous. There is ample support on the record for that finding, and we adopt it in this review.

¶ 30.  In respect to the panel majority's conclusions regarding her misconduct, Judge Tesmer argued that the prohibition of "private interviews, arguments, briefs or communications designed to influence" a judge's decision did not apply to her accepting assistance from a "disinterested law professor." She based that argument on the history of SCR 60.01(10), the practice of some judges who were subject to a similar rule, the fairness context of the rule, and the testimony of four Wisconsin judges regarding their understanding of it.

¶ 31.  The history of SCR 60.01(10), including the related provision now set forth in the 1997 Code of

Judicial Conduct,[8] provides no support for Judge Tesmer's argument for the reason that she used Professor McCormack's assistance not because he was a law professor with expertise in the particular fields of law at issue in the cases before her but because he was a "best friend" and experienced in legal writing. The historical development of rules regulating judges' communications with law professors and other legal experts is not relevant to the rule at issue here.

¶ 32. Judge Tesmer's argument based on the practice of a handful of judges in this country who were subject to an ethical rule similar to SCR 60.01(10) to consult regularly with legal experts and others about pending cases and issues is unpersuasive. There is ample authority, some of which cited by the Judicial Commission, for the opposite proposition — that a judge's private, undisclosed communication with persons outside the judicial system is improper. Moreover, there was no evidence that Judge Tesmer either was aware of or relied on the practice of other judges subject to a similar rule in determining whether her conduct was prohibited by our rule.

¶ 33. Focusing on the portion of SCR 60.01(10) that states the need for a judge's adherence to rules of fair play, Judge Tesmer argued that the prohibition of private communications designed to influence a judge's decision set forth in that rule is to be interpreted as limited to communications that would pose a threat to fair play, that is, communications with persons interested in the matter. It is her position that the only communications that threaten fairness are those with interested parties and that give one side an advantage in a contested matter. Thus, she contended, her com-

---

[8] SCR 60.04(1)(g).

munications with an "objective and disinterested professor" did not threaten fair play and were not prohibited by the rule.

¶ 34.  We find no merit to that argument. The rule, by its terms, prohibits *private* communications designed to influence a judge's decision, and it is the element of privacy that impinges on fairness. The fundamental fairness to be zealously guarded and scrupulously adhered to implicates the basic principle of American justice cited by the dissenting panel member: "That the parties will present their case to the judge, who will decide their dispute under the law and on the facts of the case." A corollary to that principle is that persons outside the judicial system have no place in a judge's decision making.

¶ 35.  That is not to say that a judge may not seek independently the advice of an expert on the state of the law applicable to a particular proceeding. Our current rules specifically authorize such communication but require that the judge notify the parties in the pending proceeding, inform them of the information received, and afford them the opportunity to respond to it. Yet, expert advice on legal issues from a person outside the judicial system is not equatable to an outside person's direct involvement in the discussion of outcomes of dispositive motions and the development of rationales to support them. The latter poses a significant threat, actual or potential, to the fairness of the proceeding. The panel majority rightly concluded that SCR 60.01(10) is not limited to improper influences on a judge's decision; it extends, in the majority's words, "to 'well-intentioned' influence such as that offered by Professor McCormack."

¶ 36.  In order to ensure that litigants and other persons interested in matters pending in the courts

may become informed of the identity of the persons with whom the judges consult in carrying out their adjudicative responsibilities, we shall propose for adoption a rule of judicial administration requiring each judge to have on file with the clerk of the judge's court and with the chief judge of the judicial administrative district the names of staff — law clerks, judicial interns, externs, and others — who participate to any extent in the judge's decision-making process. Following notice and a public hearing on the proposal, we will adopt a rule to address the concerns raised in this proceeding.

¶ 37.  While the panel majority found that Professor McCormack had no interest in any case on which he provided assistance, was not acquainted with any litigant in any of those cases or any counsel to a litigant, witness, or anyone else involved, and had no interest in the outcome of any of the motions on which he worked, the prohibition of private communications designed to influence a judge's decision is intended not only to prevent actual unfairness to litigants in pending proceedings but also to avoid the potential for unfairness. In that respect, the panel majority properly took into consideration that Professor McCormack was not subject to the same regulation and control as a member of Judge Tesmer's staff would be. Notwithstanding that she always reviewed his work before incorporating it into her own and that the confidentiality of their discussions was preserved, Professor McCormack was not subject to Judge Tesmer's disciplinary authority or to sanctions that might be imposed on a court employee.

¶ 38.  Further, the rule is also directed at avoiding the appearance that the process might be unfair. Judge Tesmer's regular recourse to Professor McCor-

mack's review of confidential law clerk memoranda, their discussion of fundamental rationales for decisions she initially arrived at, and his development of those and other rationales to support her eventual decisions reasonably could be perceived by litigants, had they been aware, that Judge Tesmer was deciding substantive matters on the basis of material and arguments of which they were unaware and had no opportunity to confront.

¶ 39. The fourth basis of Judge Tesmer's argument that the proscription of SCR 60.01(10) did not apply to her use of Professor McCormack's assistance was the testimony of four current or former judges of the Milwaukee county circuit court, who testified that they did not view the acceptance of assistance from a disinterested law professor as violating that rule. Judge Tesmer contested the panel majority's limitation of the use of that testimony to the issue of discipline to be recommended. She took the position that the judges' understanding of the rule was relevant to the issue of whether it stated with sufficient clarity the judicial conduct that it proscribed.

¶ 40. The panel majority properly rejected the testimony of the four judges on the issue of whether Judge Tesmer's conduct violated the Code of Judicial Ethics provisions, as that was the ultimate issue of law to be decided, one on which testimony is not admissible. Moreover, those judges explicitly were not called as expert witnesses, nor were they qualified as experts during their examination.

¶ 41. The other rule of the Code of Judicial Ethics the panel majority concluded that Judge Tesmer violated is the prohibition of a judge's initiating, permitting, engaging in or considering ex parte communications concerning pending actions or

proceedings, SCR 60.20. Judge Tesmer based her argument that her conduct did not violate that rule on what she termed the common understanding of "ex parte communication." Relying on the *Black's Law Dictionary* definition of "ex parte" as "On one side only; by or for one party; done for, in behalf of, or on the application of, one party only," she took the position that to be ex parte, the communication must be with a party or a person acting in a party's interest outside the presence of another party to an adversarial proceeding. Thus, she contended, the rule did not apply to her use of Professor McCormack's assistance, as he was neither a party to a pending proceeding nor acting on a party's behalf and had no interest in any case on which he worked. The panel majority rejected that narrow and overly restrictive interpretation of "ex parte," noting that it would have the effect of jeopardizing the fundamental fairness of proceedings.

¶ 42.    Judge Tesmer's position that in order to be prohibited an ex parte communication must have the potential to jeopardize the fairness of a proceeding by giving one party an advantage in having access to the judge is unduly restrictive. Her insistence that Professor McCormack's work on her pending cases did not place one party in any of those cases at a disadvantage and thus did not jeopardize fairness ignores the fundamental principle that a fair hearing requires each party to have a reasonable opportunity to hear the claims of an opposing party and respond to them.

¶ 43.    Judge Tesmer's discussions with a person outside of and unconnected with the judicial system concerning dispositive motions in proceedings pending before her outside the presence and without the knowledge of the parties to those proceedings constituted ex parte communications as that term is used in SCR

60.20. The ex parte communication prohibition set forth in the current Code of Judicial Conduct, SCR 60.04(1)(g), now makes explicit what was implicit in its predecessor. The affirmative statement introducing the current prohibition states, "A judge shall accord to every person who has a legal interest in a proceeding, or to that person's lawyer, the right to be heard according to law." Two of the exceptions to the prohibition that follow concern communication with legal experts, other judges and court personnel:

> . . .
> 2. A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice and affords the parties reasonable opportunity to respond.
> 3. A judge may consult with other judges or with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities.

¶ 44. Our determination that Judge Tesmer's use of Professor McCormack's assistance on dispositive motions in pending cases violated two rules of the Code of Judicial Ethics does not itself constitute a determination that she thereby engaged in judicial misconduct. Because the statutory definition of judicial misconduct specifies "wilful violation of a rule of the code of judicial ethics," there remains the issue of whether her violation of those rules was wilful. We determine that her violation of the private communications prohibition was wilful and that her violation of the ex parte communications proscription was not.

¶ 45. Prior judicial disciplinary cases have established that "wilful" means that the judge's conduct was not the result of duress or coercion and that the judge knew or should have known that the conduct was prohibited by the Code of Judicial Ethics. In *Judicial Disciplinary Proceedings Against Gorenstein*, 147 Wis. 2d 861, 872, 434 N.W.2d 603 (1989), the statutory term "wilful" was understood to mean "freely made and not the result of duress or coercion." The issue of a judge's knowledge as an element of wilfulness arose in *Judicial Disciplinary Proceedings Against Pressentin*, 139 Wis. 2d 150, 155, 406 N.W.2d 779 (1987). There we held that a judge's conduct was wilful, whether or not the judge had actual knowledge of the prohibition of a rule of the Code of Judicial Ethics, for the reason that the judge was chargeable with the knowledge of the ethical rules governing judges.

¶ 46. Here, there was no contention or finding that Judge Tesmer's conduct was the result of duress or coercion. It was also uncontested and the panel specifically found that Judge Tesmer had a good faith belief that Professor McCormack's assistance was permitted under the Code. The issue, then, is whether Judge Tesmer was chargeable with the knowledge that her conduct violated the two Code provisions. The panel majority concluded as a matter of law that she should have known her communications with Professor McCormack were prohibited by those Code provisions.

¶ 47. Contesting that conclusion, Judge Tesmer asserted that the only evidence in the record relevant to that issue was the testimony of the four circuit judges that they did not view either rule as prohibiting a judge from accepting assistance from a disinterested law professor. Based on that testimony, Judge Tesmer

also argued that the panel majority erred in concluding that the private communications prohibition in SCR 60.01(10) was not fatally ambiguous, as it determined that "[n]o reasonable judge would have believed that enlisting the aid of a person completely removed from the judicial process was acceptable in light of [that prohibition]."

¶ 48.   Judge Tesmer contended that the panel majority improperly limited its consideration of the judge's testimony to the issue of discipline to be recommended. She argued that their testimony was relevant on the issue of what a reasonable judge would have understood the rule to prohibit and, thus, to the issue of whether she should be held chargeable with the knowledge that her conduct violated that prohibition.

■■

¶ 49.   The panel majority properly restricted the use of the judges' testimony to the issue of discipline. The testimony of those judges, none of whom was offered as an expert witness, was neither relevant nor admissible on the issue of whether Judge Tesmer's communications with and use of Professor McCormack violated the provisions of the Code of Judicial Ethics. That was the ultimate legal issue for the panel majority to decide in the first instance. Moreover, in respect to its relevance to the wilfulness issue as stated by Judge Tesmer, as none of the judges testified to having had any conversation with Judge Tesmer prior to the commencement of this disciplinary proceeding on the subject of Professor McCormack's involvement in her work, their testimony was not relevant on the question of what she knew or should have known at the time she had him assist her.

¶ 50.   The panel majority properly concluded that Judge Tesmer's use of Professor McCormack's assis-

tance in deciding substantive motions in pending cases was a wilful violation of the rule proscribing, on an aggravated or persistent basis, private communications designed to influence a judge's decision, as she should have known that it violated that rule. We explicitly invited judges' attention to the Code's prohibition of private communications designed to influence the judge's decision in *Bahr v. Galonski*, 80 Wis. 2d 72, 257 N.W.2d 869 (1977). There, the judge appeared to have considered evidence and opinions outside the record in a child visitation modification proceeding, but there was no allegation there that the judge's informal communications exerted any particular influence upon the matter at issue. The judge acknowledged on the record that he discussed the case with a family court commissioner, his wife, and "anybody who I thought could help me to make up my mind." *Id.*, 89. Because Judge Tesmer's violation of SCR 60.01(10) was wilful, it constituted judicial misconduct.

¶ 51.   In respect to the ex parte communications proscription, however, we conclude that Judge Tesmer's violation of SCR 60.20 was not wilful, as she did not know that her use of Professor McCormack's assistance violated that rule, and she was not properly chargeable with that knowledge. We disagree with the panel majority's conclusion that Judge Tesmer should have known that her contacts with Professor McCormack were prohibited by SCR 60.20. Whether or not she in fact did so, Judge Tesmer was entitled to rely on the common usage of the term "ex parte" as defined in standard dictionaries. In that respect, *Black's Law Dictionary* (Sixth Ed. 1990) defines "ex parte" as follows: "On one side only; by or for one party; done for, in behalf of, or on the application of, one party only." In

addition, the only reported cases in which a judge was disciplined for having engaged in ex parte communications concerned communications with one of the parties to a pending proceeding. *Judicial Disciplinary Proceedings Against Carver*, 192 Wis. 2d 136, 531 N.W.2d 62 (1995); *Judicial Disciplinary Proceedings Against Aulik*, 146 Wis. 2d 57, 429 N.W.2d 759 (1988). Because Judge Tesmer's violation of SCR 60.20 was not wilful, it did not constitute judicial misconduct.

¶ 52. We turn now to the issue of discipline to impose for Judge Tesmer's judicial misconduct. Judge Tesmer argued that no discipline should be imposed for the reason that the 1997 Code of Judicial Conduct adequately protects the court system by explicitly prohibiting judges from accepting the assistance of disinterested law professors unless notice and opportunity to respond are given to the parties in the underlying proceeding. The Judicial Commission contended that the reprimand recommended by the panel majority is insufficient in light of the long period of time during which Judge Tesmer engaged in the misconduct, the numerous instances of it, and the facts that she kept it confidential from litigants and colleagues and apparently never consulted the ethics rules that might have applied to it. It also emphasized the potential her misconduct created for harm to the court system and to the public it serves. The Judicial Commission took the position that Judge Tesmer's misconduct warrants her suspension from judicial office for six months.

¶ 53. The panel majority addressed the seriousness of the misconduct and the impact it had on the judicial system and recommended a reprimand as the appropriate discipline. It considered the impact of the misconduct on the judicial system to have been miti-

gated by the fact that Judge Tesmer retained control over the decisional process in respect to the outcome and the choice of supporting rationale in each of the cases in which Professor McCormack assisted her. The panel majority also took into account that Judge Tesmer's conduct was motivated by a desire to provide litigants with well-crafted opinions and that she believed Professor McCormack's contribution to those opinions to have been no different than that provided by a regularly-employed law clerk.

¶ 54.   We determine that on the facts and circumstances before us, Judge Tesmer's judicial misconduct warrants the reprimand recommended by the panel majority. Her use of Professor McCormack to assist her in dealing with dispositive motions in pending cases created a serious threat to the fairness of those proceedings and to the integrity of the judicial process in general. She shared with someone unconnected with the judicial system confidential information and work product of her staff, discussed with that person her tentative decisions on dispositive motions and rationales to support them, and was influenced by him on the issues awaiting decision in pending cases. While the potential for harm to the court system, to the litigants in the cases she decided, and to the public's perception of the fairness of the judicial system was great, Judge Tesmer's insistence on retaining and exercising ultimate decision-making authority in those cases and her confidence in Professor McCormack's disinterest and discretion in assisting her mitigate the severity of the disciplinary response to that misconduct. So, too, does her good faith belief, albeit unjustified, that having Professor McCormack assist her in disposing of pending motions was not prohibited by the Code of Judicial Ethics.

¶ 55.   It Is Ordered that the Honorable Louise M. Tesmer is reprimanded for judicial misconduct established in this proceeding.

¶ 56.   WILLIAM A. BABLITCH, J. (*dissenting*). Ask any judge or justice what duties they assign to law clerks/interns and the response will be largely the same: draft memoranda on issues of law; draft memoranda on cases; assist in the drafting of opinions; research; discuss issues and cases. This, of course, was precisely the role of Professor McCormack.

¶ 57.   The majority says that Judge Tesmer "should have known" that her use of Professor McCormack violated the Code of Judicial Ethics. But just what is it about her use of Professor McCormack as a law clerk/intern that she "should have known" was a violation? The majority opinion fails to answer that question with any degree of clarity. And that, I submit, is because there is no clarity, no direction, to be found. The basic problem is the lack of any rules, regulations, or guidelines with respect to law clerks/interns. Without them, judges have been left largely adrift as to where the lines are drawn. Accordingly, I conclude that there is no standard that gave any degree of fair notice to Judge Tesmer that what she was doing was a violation. It is not Judge Tesmer who has failed the system; it is the system that has failed Judge Tesmer.

¶ 58.   Judge Tesmer is accused of violating SCR 60.01, which read literally forbids contact with anyone with respect to the judge's decision making responsibility. No one suggests it be read literally: to do so would be to forbid the use of law clerks/interns who are an accepted part of the judiciary.

734

¶ 59.   Thus the question is:. where are the lines drawn? Who can be a law clerk/intern? What are the parameters of utilization?[1]

¶ 60.   May a law clerk/intern be a law professor? The Judicial Commission and the majority opinion point to no rule, regulation or guideline forbidding it, and I can find none.

¶ 61.   May the law clerk/intern do some or all of their work outside the actual physical surroundings of the court to which they are assigned? The Judicial Commission and the majority opinion point to no rule, regulation or guideline forbidding it, and I can find none.

¶ 62.   Must the law clerk/intern be part of a formally recognized program of law clerks/interns? The Judicial Commission and the majority opinion point to

---

[1] I note that Rules for the First Judicial District, State of Wisconsin (1990) regarding legal interns and law clerks provide as follows:

VII.   **LEGAL INTERNS AND LAW CLERKS**

148.   ASSIGNMENT

Legal interns and law clerks shall be assigned by the Chief Judge or Deputy Chief Judge.

151.   PRIVILEGE

All transactions and communications between a judge and his assigned legal intern or law clerk, during the period of each assignment, are privileged to the judge.

154.   WORK PRODUCT

The work product of a judge who has been assisted by a legal intern or law clerk is the sole responsibility of the judge.

The Rules are the same today. The Judicial Commission neither briefed nor argued that these rules apply. I can only conclude that the Rules for the First Judicial District are irrelevant to this case or are largely ignored.

no rule, regulation, or guideline requiring it, and I can find none.

¶ 63.  Must the law clerk/intern be registered with the court where the law clerk/intern works? The Judicial Commission and the majority opinion point to no rule, regulation or guideline requiring it, and I can find none.

¶ 64.  Must the law clerk/intern be a graduate lawyer? The Judicial Commission and the majority opinion point to no rule, regulation or guideline of the circuit court requiring it, and I can find none.

¶ 65.  Must a law clerk/intern be at the very least a law student? The Judicial Commission and the majority opinion point to no rule, regulation, or guideline requiring it, and I can find none.

¶ 66.  If the law clerk/intern must be a lawyer, must that person be only a "recent graduate" or is there no limit to the number of years that have passed since law school to be eligible? The Judicial Commission and the majority opinion point to no rule, regulation or guideline providing the answer, and I can find none.

¶ 67.  Can a law clerk/intern, performing his or her duties as a law clerk/intern, be simultaneously employed outside the judicial system? The Judicial Commission and the majority opinion point to no rule, regulation or guideline providing the answer, and I can find none.

¶ 68.  The questions posed, and not answered by any rule, regulation, or guideline, leave all judges and not just Judge Tesmer in a legal and ethical quandary. If the majority's decision is a rule of reason, as suggested by the majority's ambiguity in setting out precisely what it is about Judge Tesmer's actions that violate the Code, it is a rule of reason left solely to an after the fact determination subject to the eyes of the

beholder. That is not fair, it is not just, it is not practical. It contravenes fundamental notions of fair notice and due process.

¶ 69.  The majority opinion, by drawing the line here, provides a start in the right direction. At least we all know that we cannot use a law professor as a law clerk/intern if the professor works out of our home on weekends. But we must draw the lines more brightly. We must provide rules, regulations and guidelines to assist all of us in knowing what are the parameters. What if the next case involves a law professor working in chambers during court hours?

¶ 70.  Everyone agrees that Judge Tesmer's use of Professor McCormack was in good faith: she did not believe her actions were in any way wrong. Everyone agrees that she maintained decisional responsibility. Everyone agrees that Professor McCormack was a totally disinterested participant. Everyone agrees that he functioned, in essence, as a law clerk/intern.

¶ 71.  Nevertheless the majority says she is guilty of judicial misconduct. But what exactly, in retrospect, was wrong here? Was it that he was a professor? Or was it that Professor McCormack was her friend? Or was it that he worked at her home instead of in chambers? Or was it that he worked only on weekends?

¶ 72.  To hold as does the majority that Judge Tesmer's use of Professor McCormack was willful because she "should have known" it was beyond the bounds, is to ignore our own failings in providing guidance on these questions. As part of the order in this case, this court should establish a panel to explore and answer these questions in order to provide guidance for the future.

¶ 73.  Given the need for some basic understanding with respect to the role of law clerk/interns, I agree

with the majority to the extent that in the future these actions constitute a violation of the Judicial Code. This at least gives notice to all judges that there are some limits. But I further conclude that Judge Tesmer's actions were not willful. Given the lack of rules, regulations or guidelines clearly delineating that these actions were wrong, she did not have fair notice and thus should not be held to a "should have known" standard. Accordingly, I respectfully dissent to that portion of the majority opinion finding that Judge Tesmer is guilty of judicial misconduct.

¶ 74.   I am authorized to state that Justice Janine P. Geske joins in the dissent.